HAMILTON (DICK v.). See Case No. 3,890.

---

## Case No. 5,979.

### HAMILTON et al. v. DILLIN.

[13 Int. Rev. Rec. 164.]

Circuit Court, N. D. Tennessee. April Term, 1871.[1]

FACTORS—RIGHT OF ACTION—ACT JULY 13, 1861—ACT JULY 2, 1864—EXTORTION.

1. Factors who are compelled to pay an illegal exaction to an officer of the government for permission to ship produce in their charge are entitled to maintain a suit to recover the amount of such exaction in cases where the owners themselves might do so.

2. The regulations of the secretary of the treasury made in pursuance of the act of July 13, 1861 [12 Stat. 255], requiring, as a condition precedent to the shipment of cotton from the disloyal to the loyal states during the war, payment of four cents per pound upon the cotton to be so shipped, were legal and valid.

[See note at end of case.]

3. Had these regulations been invalid, the act of July 2, 1864 [13 Stat. 375], was sufficient to adopt and ratify them, and to legalize the action of the officers of the treasury department thereunder.

[See note at end of case.]

4. If illegal exactions are made by officers of the government involving payment of money, if the money is paid without objection it cannot afterward be recovered.

This was an action of assumpsit brought to recover $281,488 48, being the aggregate of payments of four cents per pound upon cotton made by plaintiffs [A. Hamilton & Co.] between August 13, 1863, and June 11, 1864, to defendant [J. R. Dillin], as surveyor of customs at Nashville, for permits to ship the cotton from Nashville to the loyal states. This requirement was made under regulations prescribed by the secretary of the treasury under authority conferred upon him by the act of July 13, 1861, with regard to intercourse licensed by the president between the loyal

[1] [Affirmed in 21 Wall. (88 U. S.) 73.]

and disloyal states. The cotton upon which these payments were made was shown to have been in charge of plaintiffs as owners or factors of the owners. It was not shown which. No protest was made to the exaction at the time of making any of the payments. The money had been duly paid into the treasury before the suit was commenced. It was conceded that during the period in question the requirement was generally known, and that defendant would not have permitted any shipment without compliance with it, and that the result of any attempt to evade it would have been the seizure and condemnation of the cotton.involved.

For the plaintiffs it was contended that they were entitled to maintain the action as factors even if their factorship had terminated before the commencement of the suit; also, that the exaction imposed by the regulations complained of was authorized by the act of July 13, 1861; that if congress had intended to authorize such an exaction, it was not competent for them to do so, inasmuch as the same was in reality a tax, and the imposition thereof an act of legislative power which congress could not constitutionally delegate; that the act of July 2, 1864, did not intend to ratify the regulations in question, and that it would not have been competent for congress to have done so, for the same reason which precluded the original grant of the power; also, that the payment of the money under circumstances which would, as it was well known, have made any protest unavailing, was in essence a compulsive payment, since the plaintiffs were compelled to make the payment in order to obtain permission to ship their cotton.

Upon the other hand, is was contended that there could be no recovery by plaintiffs in any view of the law upon the other points, except in the character of owners of the cotton upon which the payments had been made, and that they had not shown that they were such owners, but only that they were owners or factors of the owners; that it had not been shown that, at the commencement of the suit, plaintiffs were even the factors of any of the owners, and that the mere fact of having been six years previously such factors for a day or a week could not empower them to maintain the suit after the business of the factorship had been closed, and perhaps all their principals had died. But that aside from this, plaintiffs could not recover because they had not objected to the requirement complained of at the time, nor indeed until long after the money had been paid into the treasury, and so the payments had been in the view of the law voluntary. And, further, that independently of the foregoing, the regulations complained of were perfectly valid. That the act of July 13, 1861, conferred upon the secretary of the treasury the power to make regulations for the conduct of the trade to be licensed between the loyal and disloyal states by the president. That the power to regulate included the power to make the charge complained of. That under the power to "regulate" commerce contained in the constitution, congress exercises the power to regulate navigation, which included the imposition of tonnage, light-money, etc., and the requirement of steamboats and· vessels engaged in the coasting trade to take out annual licenses, involving payments of money; so that it appeared that the word "regulate" included the requirement of money. That the intention of congress was plain to confer the power upon the secretary, for aside from the breadth of the term "regulations" employed by them, the action of the secretary himself, implying his own construction of the power, was entitled to great consideration in view of his eminent character, and also in view of the fact that he was of course in familliar conference at the time of the passage of the act with the members of congress; also from the fact that the power was exercised immediately under the eyes of congress without provoking any expression of disapproval upon their part, and, what put this question beyond all controversy, from the fact that by the act of July 2, 1864, congress made mention of the moneys collected under the regulations complained of, and provided for their disposition. That the act of July 2, 1864, would have ratified the regulations and the action had under them even if these had not been originally legal; and cases were adduced showing that certain actions of municipal corporations ultra vires had been held to have been retroactively made valid by subsequent legislation.

As to the incompetency of the original grant, or the subsequent ratification, for the reason that neither would have involved the delegation of legislative power, it was urged that while the power of taxation was a legislative power and insusceptible of delegation, the requirement in question was not a tax. That it was made in the exercise of the war power in the enemy territory, and was such an act as without the act of July 13, 1861, the president might have done as commander-in-chief of the army and navy, and the regulations were approved by the president. It had been held that in time of war the president might erect a military government in conquered territory, with courts of justice, and power even to lay and collect duties. It had been settled that the late civil war involved while it lasted all the effects and consequences of a war between independent nations, though when it was over rebels might individually be called to account as traitors. During the war, then, Tennessee being enemy country and intercourse between its inhabitants and the rest of the states unlawful, the president might have licensed trade under proper restrictions between the people in localities firmly occupied in the enemy territory and those supporting the government. That a measure bearing upon the conduct of the war and in mitigation of its general effects

was as truly a war measure as one intensifying these effects. That the requirement of payment of proper fees and charges for a privilege which might be withheld altogether from enemies, was certainly not a restriction beyond the president's power. If a military government emanating from him might impose duties on imports, he might certainly require payment of such fees for the privilege to trade granted to enemies. That the act of July 13, 1861, was restrictive of the president's powers, who but for this might have licensed the trade in question absolutely, while the act required it when licensed to be carried on under the regulations imposed by the secretary. But it must be constantly kept in mind that the power in question would have existed without the act, and that therefore the plaintiffs must resort to the act to restrict the power; and when the act is considered, so far from restricting this power, it contains a declaratory grant of the power to the secretary of the treasury, who was selected to frame the regulations because they were to contribute to his department, but for which, doubtless, the secretary of war would have been chosen for this purpose.

H. H. Harrison and Edward Jordan, for plaintiffs.

R. McP. Smith, U. S. Atty., and J. R. Dillin, for defendant.

THE COURT (charging jury). This case is one of great importance, both from the amount in controversy and the character of some of the principles involved, which affect many persons residing in the Southern states. I regret that the briefness of the time intervening between the trial of the case and my enforced departure to Memphis to open the courts there at the appointed time for the Western district, has precluded a more elaborate consideration than I have been able to bestow upon the points discussed by the counsel upon both sides, and I would hardly be willing now to act in the premises if I were not satisfied that, whatever the result may be here, the unsuccessful party will renew the contest in the supreme court of the nation, a legally infallible tribunal, upon which, therefore, will be devolved the responsibility of disposing of the case.

The questions to be passed upon by the court have been argued by the counsel upon both sides with surpassing ability. They have been presented in every aspect, and illustrated by luminous and exhaustive reasoning and an ample array of authority. Counsel have left nothing undone which could have been done to establish their respective positions.

The first point in the order of the contest is whether plaintiffs are entitled to maintain this suit in the alternative character of owners or factors. It is objected that they can recover, if at all, only in the character of owners of the cotton upon which the requirement of four cents per pound was paid by them, and that, not being shown to have been such owners, but only factors of the owners, they are in no better position than if they had been factors in respect of all of the cotton in question. I do not regard this point as well taken. If as factors in charge of the cotton the plaintiffs were required to pay and did pay for permits to ship the same to the loyal states, and the exaction of the money so paid were illegal, I think that they became entitled to recover the aggregate of the money thus paid, unless there is some reason to the contrary which would preclude a recovery by the owners themselves.

I come now to the main point in controversy, one of vastly more consequence than that just disposed of. Were the regulations of the secretary of the treasury, approved by the president, which imposed the requirements in question, illegal and void? These regulations were made in pursuance of authority conferred by section 5, Act July 13, 1861, which provides that, under certain circumstances, the president might issue his proclamation declaring the inhabitants of certain states in insurrection against the United States, and that, thereupon, intercourse between them and the rest of the United States should be unlawful, except such as might be licensed by the president and carried on under regulations prescribed by the secretary of the treasury. By these regulations, which were approved by the president, permits were required for all shipments to be granted by officers appointed at various points by the secretary of the treasury. The surveyor of customs, the defendant in this cause, was the only officer at Nashville authorized to grant a permit for the shipment of cotton therefrom to the loyal states, and certain "fees" were required to be paid before the permit was to be granted. Section 42 of the regulations of September 11, 1863, provided that "the following fees were prescribed," and, among others, "for each permit to purchase cotton in any insurrectionary district and to transport the same to any loyal state per pound ten cents," etc.

It is contended that the power vested by the act of July 13, 1861, in the secretary of the treasury to make regulations respecting the trade to be licensed by the president, was not intended to include the power to impose these charges, and that congress had no constitutional power to authorize the secretary to impose them, because, it is said, the requirement was in essence a tax, and the power of taxation, being legislative in its character, is not susceptible of delegation to an executive officer. And it is denied that the act of July 2, 1864, intended to adopt and ratify the regulations in question and the action of the officers of the treasury department thereunder, while it is contended that such an effect cannot have been produced, even if this was the intention of the act, for the same reason which would have

invalidated the original grant of the power if attempted to be made. Certainly the act of July 13, 1861, did not attempt to confer upon the secretary of the treasury the power to lay a tax. And it is conceded that such a power could not have been constitutionally conferred upon him by congress, or retroactively legitimated if assumed to be exercised by him. The argument that the requirement in question was a tax was very ingenious, and at the time impressed me very strongly. But upon reflection I am unable to consider this as a tax. A tax is defined to be a rate or sum of money assessed on the person or property of a citizen by government for the use of the nation or state. Taxes are uniform throughout the country. But the charge in question was only to be enforced in the states declared to be in insurrection. Let us consider their situation at the time. The president, by his proclamation issued in pursuance of the act of July 13, 1861, had declared the inhabitants of the state of Tennessee, among other states, to be in insurrection against the United States. It is perfectly well settled that they were, in the view of the law, public enemies of the United States while the war existed. The effects and consequences of our Civil War while it continued were precisely the same as if it had been a war between two independent nations. By virtue of the act of July 13, 1861, and, aside from this, as a consequence of the war, intercourse between the people of Tennessee and those of the loyal states was prohibited. The state was, as it were, outside of the government. It was enemy territory. Independently of the act of July 13, 1861, the president as the chief executive of the nation, the commander-in-chief of the army and navy, had power, under proper circumstances, in the exercise of a sound discretion, to mitigate the general effects of the war by permitting the inhabitants of localities of the enemy territory firmly occupied by the national forces to trade with the loyal states. He had the right to grant this privilege, for such it was, under restrictions. He might prescribe as a condition the payment of proper fees and charges. The regulations in question were approved by the president. The war did not, of course, create any new powers in the president not previously contained in the constitution. But powers which slumbered in peace awoke in time of war. A step in mitigation here and there of the effects of the war was as truly a war measure as one in the contrary direction. It cannot be said that the fees charged here were in excess of the power with regard to the trade in question. It is clear that they were not ratable charges upon the citizens of the United States in normal relation to the government, and so within the definition of a tax. They were fees charged for the privilege of trading in the products of the enemy country; and shipping these to that portion of the country in which the authority of the government was acknowl-

edged and upheld. Their imposition was administrative in its character, being the exercise of the war power in the enemy country. And this would have been lawful without the act of July 13, 1861. But this act expressly authorizes the secretary to make regulations governing this trade. This provision certainly does not take away the power to impose the charges which existed without the provision. In the regulations made in pursuance of this act, these charges are denominated "fees." I cannot doubt that it was the intention of congress to confer the power in question. The power to make regulations is broad enough to include it. The authority of the secretary's own construction, in view of his eminent character, is great, and then he was, of course, at the time of the passage of the act, in familiar intercourse with members of congress who passed it, and the regulations were approved by the president who approved the act. And, besides this, the power was exercised immediately under the eyes of congress without any expression of disapproval upon their part, both by the secretary in office during the period in question, and by his successor, whose construction was similar to his predecessor's. And lastly, in the act of July 2, 1864, congress expressly mention these fees and provide for their disposition, thereby clearly intimating their knowledge in regard to the collection of the fees under the regulations and approving thereof. In section 11 of the last-mentioned act they provide that the expenses of the execution of the act shall be defrayed "from the proceeds of the fees imposed by said rules and regulations," etc. This act not only puts to rest any lingering doubt as to the intention of congress in conferring the power to make the regulations in question, but, had the action of the secretary in making them been in excess of the power conferred, it would have operated to adopt and ratify the regulations and the action thereunder, and to render them valid ab initio. Inasmuch as I have already stated that I regard the powers in question as possessed by the president without the act of July 13, 1861, and as not being legislative in their character, it follows that unless taken away by the act they existed when exercised. We have seen that the regulations were approved by the president. But so far from taking away the power, the act of July 13, 1861, expressly confers it upon the secretary of the treasury by empowering him to make regulations to govern the trade to be licensed by the president; and if not possessed by the president, the power was one which it was competent to grant, or to adopt and ratify if exercised without having been previously granted. The secretary acting as the agent of the government, but in excess of his powers, his action might be subsequently adopted and ratified by the government.

Upon the third point discussed I am compelled to the conclusion that the payment of the money in question by the plaintiffs in

compliance with the defendant's demand without any protest or exception, was a voluntary payment, and the money cannot now be recovered. Both parties evidently regarded the requirement as perfectly legal. The money was duly paid into the treasury by the defendant. Conceding that the exaction was unlawful, it was clearly a case of a mutual mistake of law. It was acquiesced in by plaintiffs, and they cannot, several years afterwards, be heard to complain. I confess that the strong array of authorities adduced by plaintiffs' counsel to show that the payment was compulsive appeared to me, at the time, almost overwhelming; but the case of Elliott v. Swartwout, 10 Pet. [35 U. S.] 137, cited by the district attorney, appears to me to be precisely in point. I cannot distinguish the payment here from that in that case.

The jury returned a verdict for defendant.

The case will be taken to the supreme court of the United States.

[NOTE. A writ of error was taken by the plaintiff upon exceptions to this charge. The judgment of the court below was affirmed in an opinion by Mr. Justice Bradley,—21 Wall. (88 U. S.) 73,—holding that: (1) Under the authority of the act of July 13, 1861, the president and the secretary of the treasury imposed the above condition upon the transportation of cotton. (2) The position of the plaintiffs was a voluntary one, and their application for permission to engage in the trade and their payment of bonus without compulsion take the case out of that class ordinarily constituting the rule as to voluntary payments. (3) The rule of construction of an act of congress depends in some sort upon the nature of the subject-matter. (4) The power of regulation in such a case is to be taken in its broadest sense, and * * * included the power to impose such conditions as the president and secretary should see fit. (5) The conditions imposed were not in the exercise of the taxing power, but of the war power; hence they were not void as conflicting with certain revenue laws; and that congress, in the act of March 12, 1863, § 4 (12 Stat. 820), clearly recognized the president's above demarcation of insurrectionary territory.]